IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RAY ALAN BOVINETT, also known, | ) | |
| professionally as ALAN BOVINETT, | ) | <u>JURY DEMANDED</u> |
| | ) | |
| Plaintiff, | ) | |
| vs- | ) | NO. 17-cv-06229 |
| | ) | |
| HOMEADVISOR, INC., | ) | |
| a Delaware corporation; and | ) | DIST. Judge: H. Leinenweber |
| ANGI HOMESERVICES, INC., | ) | |
| a Delaware corporation *doing* | ) | |
| *business as,* HOMEADVISOR; | ) | |
| and, HAWTHORNE DIRECT, LLC, | ) | MAG. Judge: D. Martin |
| an Iowa limited liability company; | ) | |
| and DOE I through DOE V, | ) | |
| Defendants. | ) | |

## <u>AMENDED COMPLAINT</u>

Plaintiff, RAY ALAN BOVINETT also known professionally as ALAN BOVINETT, by and through his counsel, MARK H. BARINHOLTZ, P.C., complains against defendants, HOMEADVISOR, INC., ANGI HOMESERVICES, INC., HAWTHORNE DIRECT, LLC, and DOES I through V, and each of them jointly and severally, and alleges:

### <u>JURISDICTION AND VENUE</u>

1.  This Court has jurisdiction over this cause pursuant to 28 U.S.C. § 1332(a)(1). The value of the matter in controversy exceeds $75,000 exclusive of interest and costs, and the citizenship of the parties is diverse. Plaintiff is a citizen of the state of Illinois.

2.  Defendant HomeAdvisor is a Delaware corporation, citizen of the state of Colorado. Defendant ANGI Homeservices is a Delaware corporation, citizen of the state of Colorado. Defendant Hawthorne Direct is an Iowa limited liability company, whose partners, on information and belief, are not citizens of the state of Illinois.

3.  This Court also has federal question jurisdiction, as this is an action brought, in part, under the U.S. Copyright Act, 17 §§ 101, *et seq*., jurisdiction being conferred by 28 U.S.C. §§ 1331, and 1338(a), in that certain of these claims arise under the federal copyright laws.

4.   This Court also has jurisdiction under 28 U.S.C. § 2201 ("the Declaratory Judgment Act") which empowers this Court to render a declaratory judgment in the controversy.

5.   This Court otherwise has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

6.   Venue is properly laid in this District under 28 U.S.C. §§ 1391(b)(2) and (b)(3), and under 28 U.S.C. § 1400(a) where Defendants may be found.

## NATURE OF THE CASE

7.   This case arises out of Defendants' unauthorized capture, use and threatened ongoing use of Bovinett's likeness, image and persona for a digital database, and then in commercials broadcast via network and cable television and/or otherwise streamed and/or transmitted nationally and worldwide via the internet and social media (the "Commercials").

8.   The Commercials are audio-visual "video" works which promote HomeAdvisor's, and Hawthorne Direct's, and from and after October 2017 ANGI Homeservices', commercial activities in the context of HomeAdvisor's ongoing advertising campaign to attract customers and contractor participants to its' home improvement services for financial gain.

9.   Hawthorne Direct is the advertising agency and direct response media firm which has been engaged by HomeAdvisor since approximately 2012, and since October 2017 by ANGI Homeservices, to direct, participate in and implement all phases of a video-based advertising campaign that unlawfully utilizes Bovinett's likeness, identity and persona in a series of at least 57 video-based Commericals that have aired at least 197,000 times on national network and cable-based television, and been streamed at least 5,058,000 times on internet-based media.

10.   Hawthorne Direct's role was and is to be in charge of creative, production, and editing the Commercials, and being involved with the media strategies and media buys for placing and purchasing time and access to channels of broadcast and other distribution, in order to maximize financial return on media dollars invested (See, Exhs. "L" and "M" hereto, pages excerpted from *hawthornedirect.com*, last accessed May 2, 2018).

2

11.   ANGI Homeservices is the entity which, after approximately October 2017, succeeded to the business of HomeAdvisor and the HomeAdvisor brand (See, Exh. "K" hereto).

12.   Bovinett brings this action against the Defendants for fraud, promissory estoppel, breach of contract, violation of rights of publicity and privacy, and other claims to remedy the damage caused and suffered, and to prevent future damage to Plaintiff threatened by Defendants' unauthorized use of Bovinett's likeness, identity and persona.

## PARTIES

13.   Plaintiff ALAN BOVINETT ("Bovinett") is engaged in the business of entertainment, known in the Chicago entertainment community and internationally for his talent and artistry, and for his "look" as a professional for engagements in modeling and acting.

14.   Defendant HOMEADVISOR, INC. ("HomeAdvisor") is, upon information and belief, a Delaware corporation, based in or near Golden, Colorado. HomeAdvisor is also a brand, now owned and controlled by Defendant ANGI Homeservices, Inc., which, in turn, is owned and controlled by IAC/InterActiveCorp, its' New York-based parent. HomeAdvisor conducts business worldwide and within the state of Illinois, via at least two highly interactive internet websites identified as *HomeAdvisor.com* and, *HomeAdvisorPros.com*. HomeAdvisor also conducts business targeted at Illinois via hand-held mobile devices and social media platforms, *e.g.*, YouTube, Facebook and Instagram, and via extensive airing of network and cable television broadcasts calculated to reach Illinois service providers and consumers on a daily basis, and all calculated to elicit immediate online direct responses from Illinois residents and businesses.

15.   Defendant ANGI HOMESERVICES, INC. *d/b/a HOMEADVISOR* ("ANGI Homeservices") is, upon information and belief, a Delaware corporation, also based in or near, Golden, Colorado; ANGI Homeservices is the entity which, by virtue of a merger with a company known as Angie's List,[1] has succeeded to the business of HomeAdvisor and the HomeAdvisor brand ("the Merger").

---

[1]  Plaintiff does not assert a claim against Angie's List.

16.   ANGI Homeservices is an entity formed for the purpose of merging HomeAdvisor with the firm known as Angie's List to form a single publicly traded company designed to match home services consumers with professional home services providers via online platforms, to conduct business worldwide and within the state of Illinois daily, and all calculated to elicit an immediate online direct response from providers and consumers located within Illinois.

17.   At or about early May 2017, IAC/InterActiveCorp, HomeAdvisor's parent, announced that the combined entity, prospectively to include IAC's HomeAdvisor business and Angie's List, and prospectively to be publicly traded as ANGI Homeservices, had the potential to attract 22 million unique online users per month, and combined had helped customers in an estimated $17 billion worth of home improvement projects for more than 200,000 US-based paying service providers in 2016, including a substantial number in Illinois.

18.   As evidenced by a Form 10-K recently filed by ANGI Homeservices with the Securities Exchange Commission on March 14, 2018 (the "Form 10-K"), the Merger deal was closed on September 29, 2017, at which time the entity ANGI Homeservices was ready to commence doing business as a new publicly traded company on October 2, 2017. (See, SEC's EDGAR database reference to SEC File no. 0001-38220, and excerpts therefrom, attached hereto as group Exh. "K")  In fact, after the Merger was completed, ANGI Homeservices' stock was listed as open for public trading on the Nasdaq exchange.

19.   Also included in the Form 10-K is a copy of the final amended Merger agreement which states, in part it was intended by the predecessor entities, including HomeAdvisor, Inc., and the successor entity, ANGI Homeservices, Inc., that the combination of HomeAdvisor, Inc. and Angie's List, Inc., after the Merger was to result in the successor entity, ANGI Homeservices, Inc., not only to own the HomeAdvisor business, but to assume all debts and liabilities of both the predecessor entities, one of which was HomeAdvisor, Inc. (*Ibid*. Exh. "K").

20.   Further disclosed in the Form 10-K are representations that at least four (4) officers of predecessor entity HomeAdvisor, Inc., would continue on in senior management positions with ANGI Homeservices, including Chris Terrill as Chief Executive Officer, William Ridenour

4

as Chief Technical Officer, Craig Smith as Chief Operations Officer, and Allison Lowrie as Chief Marketing Officer. The senior management team survived the Merger intact. (*Ibid*. Exh. "K").

21.    Indeed, ANGI Homeservices holds its principal place of business out to be in Golden, Colorado, the home of predecessor entity HomeAdvisor, Inc.  Both HomeAdvisor, Inc., and ANGI Homeservices, Inc., are and were at all times relevant, on information and belief, wholly owned subsidiaries of IAC/InterActiveCorp, a media conglomerate located in New York City. (*Ibid*. Exh. "K").

22.    Defendant HAWTHORNE DIRECT, LLC ("Hawthorne Direct"), is an Iowa limited liability company, whose principal office is located in or near Fairfield, Iowa. Hawthorne Direct also maintains a business location in Los Angeles, California, and is registered and qualified to do business there.

23.    Hawthorne Direct touts itself to be a creative, analytics and technology-driven advertising agency engaged in the business of creating and producing direct response advertising via television commercials and other media for public relations and other purposes. Timothy Hawthorne, the founder, works out of the Fairfield, Iowa home office. Among other affiliations, he is a longstanding member of the Directors Guild of America.  The Los Angeles office of Hawthorne Direct is run by Jessica Hawthorne-Castro, a former Hollywood talent agent.

24.    In addition to the tortious acts and conduct directed at Plaintiff in the state of Illinois, as more fully alleged below, at all times relevant, on information and belief, both HomeAdvisor and Hawthorne Direct, and from and after approximately October 2017 ANGI Homeservices, have and/or will continue to have regular and continuous business contacts within the state of Illinois, and have otherwise targeted their tortious acts described herein below at Bovinett knowing they would cause injury to Bovinett here in Illinois.

25.    On information and belief, Hawthorne Direct has at all times relevant regularly and continuously conducted business in Illinois for current and former clients. Such business is of the type and character rendered in connection with the wrongs alleged against Hawthorne Direct herein, namely, to act as an advertising agency. Among Hawthorne Direct's current and former

clients targeted to Illinois include not only HomeAdvisor (Defendant in the instant action), but on information and belief, Discover Financial Services, via its Riverwoods, Illinois, headquarters. On information and belief, Hawthorne Direct personnel also regularly and systematically visit and travel to Illinois to participate both as presenter and attendee to direct marketing conferences and events held here, where, on information and belief, Hawthorne Direct solicits business of the type related to the instant action, while in Illinois.

26.   In addition, on information and belief, HomeAdvisor and Hawthorne Direct, and from and after approximately October 2017 ANGI Homeservices, also conduct business in the state of Illinois, and otherwise direct their activities at the state of Illinois by one or more of the following means:  (i) by holding and acting in concert to hold HomeAdvisor out as willing to do business with the citizens of the state of Illinois, one of the most populous states in the nation; (ii) by holding and acting in concert to hold Hawthorne Direct out as willing to do business with the citizens of the state of Illinois; (iii) by targeting the state of Illinois including the City of Chicago, via highly interactive internet website(s) designed to act as on-demand marketplaces, (iv) by contracting with home services professionals and referring home services consumers to them located in the state of Illinois and the City of Chicago, (v) by maintaining online listings of such home services providers located in multiple cities in and throughout the state of Illinois, (vi) by utilizing at least one advertisement serving platform which, on information and belief, serves geo-targeted advertising aimed at Illinois, and which is otherwise qualified to do business in the state of Illinois (*e.g.*, *Google AdWords*), and (vii) by incorporating so-called "direct response" offers on their respective websites which are hard-coded into the sites, and which link to various home services firms located within the state of Illinois; and all with the intent, purpose and effect of regularly receiving a share of revenues remitted to such Defendants from home services professionals and home services consumers in Illinois.

27.   In addition to their regular and continuous business activities conducted in the state of Illinois, HomeAdvisor and Hawthorne Direct, including from and after approximately October 2017 ANGI Homeservices, at all times relevant, have by the means and efforts set forth herein

below, aimed and targeted their tortious acts and conduct at Bovinett in Illinois, knowing that they would cause harm to Bovinett within the state of Illinois where Bovinett resides and conducts business, and all with the intent to affect an Illinois interest, namely, Bovinett's personal and property rights. HomeAdvisor, and Hawthorne Direct, and from and after approximately October 2017 ANGI Homeservices, have thereby created a nexus between their commercial activities to conspire in order to commit the wrongful and tortious acts and conduct aimed at Bovinett in Illinois, connecting such acts and activities to the controversy at hand.

28.   As more fully set forth below, Defendants DOE I – V are persons and/or firms whose identity(s) and/or particulars of participation are presently unknown to Plaintiff, but which, upon information and belief, participated, directly or indirectly in, or benefitted directly or indirectly from, the wrongful acts against Plaintiff alleged herein.

29.   Plaintiff is further informed and believes and thereon alleges that at all times relevant hereto each of the Defendants, HomeAdvisor and Hawthorne Direct, including from and after approximately October 2017 ANGI Homeservices, acting in concert with one another and with one or more of the Doe Defendants, in doing the acts hereinafter alleged, was acting as the agent, affiliate, officer, director, manager, principal, alter-ego, and/or employee of the remaining Defendants and/or of one another, and was at all times relevant acting within the scope of such agency, affiliation, alter-ego relationship and/or employment; and actively participated in or subsequently ratified and adopted, or both, each and all of the acts and conduct alleged, with full knowledge of all the facts and circumstances, including but not limited to, full knowledge of each and every violation of Plaintiff's rights and the damages to Plaintiff proximately and otherwise caused thereby, or otherwise aided and abetted and/or conspired to facilitate such acts and conduct as herein alleged against such Defendants, and each of them jointly and severally.

## FACTUAL BACKGROUND

30.   At or about 1999, Bovinett, a mechanical engineer by training, and management consultant by profession, was "discovered" while grocery shopping. He was scouted by a talent agent who was in the business of booking talent to fit a particular "look."

31. Since approximately 2000, and in particular since approximately 2006 as a full member of the Screen Actors Guild-American Federation of Television & Radio Artists ("SAG-AFTRA" or "the Union"), Bovinett has been professionally engaged as a model and actor.

32. Within his professional sphere and beyond, Bovinett is favorably regarded as an accomplished and desirable talent. Bovinett has long been associated with his numerous performances in print, television, film and other media for professionals and lay persons alike.

33. Now in the digital era, Bovinett has created and fostered an image for himself, a "look" which he cultivates, markets and exploits, designed to fulfill the needs of various casting professionals on behalf of their commercial clients. In that regard, Bovinett maintains and moderates professional self-promotions on internet platforms including Facebook, YouTube Twitter and Instagram. Bovinett also curates his own page on the Internet Movie Database ("IMDb") a website that offers entertainment industry professionals and others the ability to review the results and proceeds of Bovinett's talent and entertainment services.

34. In significant part due to his strong appearance as an ethnically ambiguous archetype in relation to promoting his modeling and acting services, Bovinett has established himself as a professional who fulfills the advertising needs of various firms to attract multiple segments of the prospective purchasing public. Bovinett has thereby had significant success in his field, as one who projects a diverse persona, which may be exploited by firms desiring to connote endorsement or otherwise project an association with the products and services of businesses that wish to profit from targeting their marketing to such segments and/or demographic of the purchasing public.

35. Such firms contract with him to use one or more aspects of his well-established persona, including his "look" and likeness, in their commercial activities and marketing efforts. Bovinett's persona includes, among other things, his likeness, his image, and his creative acting abilities underpinning his career (a copy of one of Bovinett's composite photographs is attached hereto as Ex. "A").

36.    By carefully controlling and promoting the principled nature and integrity of his services and commercial on-camera and on-screen activities continuously over a long period of time, Bovinett has enhanced and maintained the value and goodwill of his image and persona and his ability to nurture an audience, and his identity has thereby become well and favorably known and established among his relevant professional audience and others with whom he deals.

37.    A significant portion of Bovinett's income, and his income potential, is derived from his ability to lend his likeness visually to the commercial activities of those who wish to capitalize on the look and feel of his persona. As a business, the exploitation of and ability to control Bovinett's image and persona are important economic components of his professional modeling and acting career, and have become an intrinsic and essential part of the valuable goodwill established to licensees and others in Bovinett's persona and identity.

**The ReBranding of HomeAdvisor**

38.    On information and belief, for approximately 15 years before its rebrand, HomeAdvisor, a Colorado firm formerly known as ServiceMagic, had been relying almost exclusively on search engine marketing (SEM) (also sometimes referred to as PPC, *i.e.*, pay-per-click), to access and exploit the multi-billion dollar home services marketplace. Since approximately 2004, ServiceMagic was, and until the rebrand remained, a subsidiary of IAC/ Interactive Corp, a digital media conglomerate owned and operated by Barry Diller, a former Hollywood movie mogul. (See, group Ech. "K" hereto)

39.    According to publicly available sources, ANGI Homeservices' Chief Marketing Officer Allison Lowrie, a senior marketing executive with HomeAdvisor at the time of the rebrand, HomeAdvisor professionally engaged with Hawthorne Direct around 2012 to create new advertising campaigns. In a dedicated case study posted to its own branded website, Hawthorne Direct publicly brags about its strategy to create "compelling direct response [TV] spots" for HomeAdvisor, and the tremendous success in terms of "return on media investment" to HomeAdvisor, since "partnering with Hawthorne in 2012" (See, Hawthorne Direct's online "Case Study" regarding HomeAdvisor, attached hereto as Exh. "M", last accessed May 2, 2018).

40.    As part of the "rebrand" in 2012, HomeAdvisor engaged the services of Hawthorne Direct to create advertising campaigns designed to combine and balance SEM with a wide variety of television commercials (TV spots). The strategy was to combine a variety of vanity URLs, custom toll-free numbers, and Hawthorne Direct's proprietary metrics, with targeted television commercials (*See*, Hawthorne's online "Case Study," re HomeAdvisor Exh. "M").

41.    Hawthorne Direct promised HomeAdvisor it could assist the brand in identifying top-performing commercials, while rotating out the less successful ones in order to maximize return on media investment dollars. Allison Lowrie, who was then HomeAdvisor's Senior V.P. of Marketing, was tapped to head up the rebrand. As noted above Lowrie is now the Chief Marketing Officer of ANGI Homeservices.

42.    Consistent with their overall duty and long-term engagement to create and implement HomeAdvisor's advertising efforts, Hawthorne Direct worked side-by-side with HomeAdvisor, coordinating and cooperating with HomeAdvisor, first to capture Bovinett's likeness in still photographs ("the Photos") and then, in turn, to exploit them in the Commercials, and from October 2017 with ANGI Homeservices, for maximum financial return.

43.    In the process of rebranding, ServiceMagic changed its name to HomeAdvisor and embarked upon the rebrand plan at the direction of Hawthorne Direct, its advertising agency.

### The Conspiracy to Capture Bovinett's Likeness

44.    On information and belief, at or about 2014, Hawthorne Direct recommended that HomeAdvisor integrate television commercials into the mix of direct response promotional channels which HomeAdvisor had been using, in order to maximize its reach to a burgeoning marketplace for home improvement services (See, Exh. "M" hereto).

45.    In furtherance of the marketing plan, on information and belief, Hawthorne Direct took charge of the television commercials component of the rebranding effort, and was instrumental in combining and coordinating its expertise in such activities with HomeAdvisor, in order to implement the fully integrated set of promotional efforts (*Ibid*. Exh. "M").

46. As a material and essential part of the plan, it was intended by HomeAdvisor, with the urging and encouragement of Hawthorne Direct, that the television commercials be created and tested over time in order to establish key performance indicators which could then be measured by Hawthorne Direct's purportedly proprietary algorithms and metrics to establish a system by which the television commercials would be evaluated for performance, and then rotated in or out of use depending on their relative success (*Ibid*. Exh. "M").

47. The goal was to create a low-cost channel for brand awareness, which could exploit the advent of low-cost digital production and post-production.

48. At all times relevant prior to the production and post-production of such television commercials, HomeAdvisor and Hawthorne Direct were determined to minimize the expense of creating and using the commercials to be created; and in furtherance of such plan decided to produce content for the commercials in a location other than the Los Angeles or New York City communities, where production costs were significant, and where on-screen talent was largely affiliated with and/or knowledgable about SAG-AFTRA and its schedules of payments and rules pertaining to TV commercials, including higher session fees and ultimately residuals and fringe benefits ("fringes"), *e.g.,* health insurance and pension contributions.

49. At or about summer 2014, Defendants HomeAdvisor and Hawthorne Direct were determined to dramatically keep their current and future costs down, by hiring Chicago-based modeling and acting talent and by creating still photography content to use in the Commercials in what they perceived to be a less sophisticated production community than Los Angeles or New York City. Defendants chose to come to Chicago.

50. In furtherance of their cost-saving plan, the said Defendants hatched a plot, orchestrated jointly by them to conceal the fact they intended to use the still photographs in television Commercials, while at the same time making false representations and engaging in other ruses calculated to mislead and conceal that fact. The misleading and/or deliberately false statements were communicated by HomeAdvisor and Hawthorne Direct personnel, both orally and in text messages and/or emails or other written communications, and were calculated to

11

convey the opposite impression, namely, that the still photographic images to be created were <u>not</u> to be used in any video-based works, here the television Commercials specifically destined for broadcast (See, Exhs. "G" and "H" hereto).

51.   Such Defendants chose a local Chicago photographer (Todd Rosenberg Photography, Inc.) and a local Chicago "print" talent agent (Julie Tallarida of Planet Earth Agency) to assist in organizing and conducting a photo shoot in Chicago (the "Shoot") to create visual content for the Commercials. But at no time did Hawthorne Direct or HomeAdvisor personnel ever advise the Chicago photographer or the Chicago based "print" agent that the true intent was to use the images to be created in such Commercials (*Ibid*. Exhs. "G" and "H").

52.   The scheme to defraud the photographer, the agent and the talent, involved a multi-faceted, rolling combination of interconnected elements and timing, including: (i) before the Shoot, absolute silence with respect to the true intent to use still photographs in television Commercials, (ii) at or about August 2014 the creation of a misleading casting notice to avoid mentioning the true intent for the still photographs, (iii) travel to Chicago on or about October 8, 2014, to oversee and manage the production and creation of the still photographs and the Shoot, (iv) ensuring that no one on the set of the Shoot made any mention of the true intent for use of the still photographs, (v) repeatedly meeting any inquiry about the so-called "Library" use of the still photographs, both before, during and after the Shoot, with the response that there was to be no use in any video-based works, *e.g.*, television commercials, and particularly "no broadcast" use, (vi) that after the Shoot, to keep repeating the falsehood that there was to be "no broadcast" use of the still photographs created at the Shoot in any video-based work, (vii) that approximately early October, but after the Shoot, to present Bovinett's print agent with a Consent form while simultaneously repeating the falsehood that there was to be "no broadcast" use of the still photographs, and (viii) ultimately at or about mid-October 20, 2014, and well after the Shoot to place Bovinett's agent under duress to sign the Consent form on behalf of all the talent who participated in the Shoot, irrespective of whether they were members of SAG-AFTRA, but while again repeating the falsehood that there would be "no broadcast" use of the still photographs,

despite the fact that such Consent form could be construed to allow the opposite (See, Exhs. "D", "G" and "H" hereto).

53.   The individuals who concocted the scheme, made the misleading and fraudulent statements, and otherwise concealed the true facts about the purpose for which the still photographs would be created and used, and who were otherwise responsible for implementing and maintaining the plan to deceive, concealing the true intentions of HomeAdvisor and Hawthorne Direct to use the still photographs in the Commercials, were, on information and belief, Allison Lowrie, Senior Marketing executive with HomeAdvisor, Jessica Hawthorne-Castro, principal of Hawthorne Direct, Lisa Landers, HomeAdvisor's Brand Marketing Manager, and Brooke Gabbert, HomeAdvisor's Vice President of Corporate Communicaions.

54.   On information and belief, at or about September 2014, it was decided by them that Brook Gabbert would be on the front lines in repeatedly communicating the falsehood that the still photographs to be created at the Shoot, were not going to be used in any television commercials, nor within any video-based work. At or about early September 2014, two or more of the individual co-conspirators participated in the creation of a misleading Casting notice (See, Exh. "B" hereto). and Brooke Gabbert forwarded the misleading Casting notice to the Chicago photographer Todd Rosenberg who, in turn, communicated the casting notice to Bovinett's print agent in Chicago. The casting notice usage verbiage was stated to be "Library," and did not suggest any intent to use or include the images in any television commercials or other video-based medium (*Ibid*. Exh. "B").

55.   At or about September 4, 2014, Bovinett was contacted by his Chicago based "print" agent who first notified Bovinett of a casting opportunity to participate as talent for the creation of still photographs to be used by the home improvement enterprise HomeAdvisor (the "Shoot"). The still photographs to be created by local Chicago photographer Todd Rosenberg, were to be created and produced in Chicago, for retention by HomeAdvisor in its "Library" database of images ("Casting Notice" email with the Shoot details is attached as Exh. "B" hereto).

13

56.  Before agreeing to be photographed, Bovinett was assured by his print agent, as she had been assured by Brooke Gabbert, that the still photographs to be created depicting his likeness would be included in such a database for use by HomeAdvisor for "print" purposes only, *i.e.*, in print ads or non- video-based electronic uses, *e.g.*, as a static image posted to a website, and not be used or incorporated by HomeAdvisor into any audio-visual, motion picture or video-based work, such as "commercials" designed for broadcast or transmission via television and/or the internet, *i.e.*, a buyout for print purposes only (See, Exh. "G" hereto).

57.  Additionally,  the terms communicated to Bovinett through his print agent in defining the usage limitation, *i.e.*, "no broadcast," appeared routine, based not only on Bovinett's past dealings with his print agent but on various other factors, including: (i) that Bovinett's print agent specialized in booking non-Union jobs limited to "print" uses only, (ii) that Bovinett's print agent assured him that, in turn, HomeAdvisor personnel had given their assurances there would be no broadcast use by any means of transmission of the still photographs to be created at the Shoot, and (iii) that since Bovinett was a full member of SAG-AFTRA, neither he nor any other of the Union-member talent participants in the Shoot, would have allowed themselves to be photographed unless HomeAdvisor had offered them a Union contract at the Shoot, to be photographed for video-based commercial purposes.

58.  In reliance on such assurances and understandings as fact, Bovinett consented to pose and be photographed in Chicago by HomeAdvisor's chosen photographer at HomeAdvisor's instance and request. On October 8, 2014, Bovinett allowed the HomeAdvisor-retained photographer to capture images of Bovinett as still photographs in Chicago.

59.  Around mid-October, after the Shoot, on information and belief, in furtherance of their scheme to defraud, HomeAdvisor personnel presented the print agent with a broadly drafted consent form (Exh. "C"), while simultaneously falsely assuring the agent that the still photographs to be created at the Shoot would not be used in any video or for any "broadcast" purpose.

60.   On or about October 20, 2014, and unknown to Bovinett, HomeAdvisor personnel, and on information and belief with the knowing and deliberate encouragement of Hawthorne Direct, while repeatedly assuring Bovinett's print agent there would be no television broadcast or transmission, or any "broadcast" use at all of the still photographs as part of any video-based work, presented the agent with the document styled 'Consent and Release' (the "Consent" form) (See, Exh. "C" hereto). On information and belief, HomeAdvisor personnel then and there duped the print agent into signing the "Consent" form, as a condition to the Shoot talent being paid (See, Exhs. "D" and "G" hereto).

61.   At all times relevant after the Shoot, the Consent form was communicated coupled with the promise to Bovinett's print agent that there was to be "no broadcast" use of the still photographs from the Shoot, or incorporation of any such still images into any Commercials, while at the same time demanding the agent's signature to the Consent form, the terms of which could be construed to the contrary; Defendants were intending to put the agent under duress, and thereby to coerce the agent into signing the "Consent" form under threat of non-payment and other harm to her business reputation, and otherwise by means not lawfully justified (Exhs. "G", "H").

62.   At no time relevant hereto, has Bovinett ever signed any voucher or contract consenting to his likeness to be captured in still photographs for incorporation into any video-based work for HomeAdvisor destined for broadcast or internet transmission use; nor has Bovinett authorized his print agent to do so or to hold herself out as having the authority to do so.

63.   Bovinett is informed and believes the accused Commercials began to be created and tested from approximately the end of 2014 through mid-2015. Those early Commercials were aired and/or transmitted during mid-2015, and some, particularly embodying Bovinett's image and likeness, continued to be used into 2016, 2017, and through the present time.

**Plaintiff Discovers the Fraud**

64.   At or about Spring 2016, Bovinett first learned that still photographic images of his likeness from the Shoot had been incorporated into video-based television Commercials, and were being broadcast on cable television, in violation of the limitations of his consent.

65.   Upon learning of the violation, Bovinett notified his Union and his print agent that the still photographs created during the Shoot were being used in the HomeAdvisor Commercials without his permission. HomeAdvisor was also notified in 2016 and again in 2017 that all such reproductions and uses of his likeness and persona should cease, and otherwise be deleted from the Commercials. (See, Exs. "D," "F," "G" and "H" hereto.)

66.   According to the Chicago based photographer Todd Rosenberg, in an email sent to Julie Tallarida at or about April 2016, Rosenberg confirmed he also "had no idea" the still photographs he was creating were destined for use in the Commercials (See, Exh. "G" and "H").

67.   At or about April 6, 2016, HomeAdvisor acknowledged there had been a material miscommunication on its' part (See, Exh. "D" hereto). Instead of making any effort to fix the problem, HomeAdvisor's refusal to cease and desist became more intransigent. Instead of stopping the offending conduct, HomeAdvisor's Brand Marketing Manager Lisa Landers, on or about April 12, 2016, produced a copy of the purported "Consent" form not signed by Bovinett, nor authorized by him (See, Exs. "D" and "E" hereto; and the "Consent" form Ex. "C" hereto).

68.   Notwithstanding such notices, during the remainder of 2016 through approximately early 2017, HomeAdvisor refused to remove the unauthorized images from the Commercials and the broadcasts thereof. In fact, on information and belief, based on key performance indicators and other metrics touted by Hawthorne Direct as its expertise (See, Exh. "M" hereto), Hawthorne Direct used Bovinett's likeness to reedit and create new versions of and/or create scores of entirely new Commercials incorporating Bovinett's likeness, and stepped up its broadcasts and transmissions of the Commercials due to their success (*E.g.*, see group Exh. "I").

69.   Although Bovinett continued to seek relief from SAG-AFTRA, he was ultimately informed it would not entertain the matter primarily due to the non-Union nature of the Shoot.

16

70.   Bovinett is informed and believes that (i) HomeAdvisor's and Hawthorne Direct's use of the phrase "Library of images..." in the casting notice, coupled with (ii) the timing and sequence of the repeated assurances to the print agent that there would be "no broadcast" use, (iii) but simultaneously accompanied by the effort to extort the agent's signature to the "Consent" form, were interconnected pieces of a scheme and device preconceived to mask HomeAdvisor's intent, as urged on, encouraged and calculated by Hawthorne Direct, to wrongfully obtain compelling still photographic images for use in its Commercials for exploitation via broadcast media, including as transmitted via the internet and social media platforms, without obligating any Defendant to pay acting talent at a broadcast rate, and further to avoid having to pay Union mandated residual payments and fringes (*e.g.*, pension contribution and health insurance) for which HomeAdvisor would otherwise be obligated to assume.

71.   On information and belief, such efforts to defraud, as above alleged and particularly the procuring of the "Consent" form, were intended by HomeAdvisor, together with Hawthorne Direct, to be a "gotcha" (See, Exh. "E" hereto), designed to put up barriers which are harmful and threatening to the talent, and otherwise would have the desired effect of enabling HomeAdvisor and Hawthorne Direct to produce nearly cost-free, discounted, professionally-cast content for its television Commercials and internet and social media use. Such content, on information and belief, produced with Hawthorne Direct's direction and encouragement, boosted Homeadvisor's traffic to its website(s) and otherwise enticed and attracted clicks, hits and views from home services consumers and contractor participants alike, all driven by the Commercials, and in turn to increase HomeAdvisor's and Hawthorne Direct's financial gain (See, Exh. "M").

### The Scheme to Defraud Plays Out Over Several Years

72.   The fraud was successful, and played out as planned by HomeAdvisor and Hawthorne Direct, from approximately September 2014 to April 2016.

73.   Once having wrongfully obtained the still photographs of Bovinett's likeness, HomeAdvisor and Hawthorne Direct went beyond Bovinett's consent by using his identity and persona to falsely and misleadingly suggest and send the message, as fact, that Bovinett was

17

willing to appear in the video-based Commercials connected to the commercial activities of HomeAdvisor's services via use of the Commercials in any and all forms of television, including but not limited to as broadcast on cable and network television and as otherwise transmitted via the internet and social media. In reality, such "facts" are not true, since Bovinett never consented to use of his image, likeness or persona via the medium of a video-based Commercial.

74.     By yielding to HomeAdvisor's and Hawthorne Direct's scheme to overreach, Bovinett would not only be suffering substantial financial loss and damage caused by his not receiving the true amounts of money to which he was entitled as a full member of the Union, or otherwise, but he would be put in jeopardy with respect to his relationship with his Union, thereby opening himself up to ongoing and perpetual professional embarrassment and humiliation for having been cheated by such chicanery, and otherwise be subject to the reputational and competitive harm he has meticulously sought to avoid throughout his career.

75.     In fact, Bovinett is informed and believes that HomeAdvisor's and Hawthorne Direct's ruse, including obtaining the "Consent" form, was calculated to fraudulently obtain and fill it's so-called "Library" with images and content which, in turn, was intended and implemented by HomeAdvisor and others with whom it associated to create the Commercials, *e.g.*, Hawthorne Direct, and from and after approximately October 2017 ANGI Homeservices, for the unlawful purpose of being able to control Bovinett's image to his detriment and his right and ability to do so himself.

76.     HomeAdvisor personnel, upon information and belief with the urging and encouragement of the producer of the Commercials Hawthorne Direct, and despite being under a duty to deal fairly and in good faith with Bovinett, concealed the fact that the still photographs from the Shoot had, in fact, been incorporated into the television Commercials. Not until approximately Spring 2016, did Bovinett learn for the first time since the Shoot, that HomeAdvisor had deceived and misled him, including duping his agent and the photographer, regarding any limits on the usage of his image and persona, *i.e.*, to exclude any and all "broadcast" usage thereof.

18

77. At all times relevant herein, it was HomeAdvisor's and Hawthorne Direct's intent that Bovinett rely on the fraudulent course of conduct, both the affirmative fraudulent statements made to Bovinett's print agent which, in turn, were repeated to him, and the fraudulent concealments pertaining to such Defendants' production, testing and airing of the Commercials.

78. HomeAdvisor and Hawthorne Direct knew their silence would induce Bovinett to not only render his services at the Shoot, but would lull him into the dark about use of the still photographs generally, enabling Defendants to capture Bovinett's likeness and persona, and to otherwise improperly incorporate and use such Photos of his likeness in the Commercials.

79. Bovinett reasonably relied on the course of fraudulent conduct engaged in by Defendants, including the affirmative misrepresentations made through Bovinett's print agent and the concealment of Defendants' true intentions for the use of the still photographs created at the Shoot, and Bovinett was tricked into performing services at the Shoot, and to commit and risk his goodwill and reputation in furtherance of what he believed to be the intended use of the still photographs (See, Exh. "F" hereto).

80. In addition to television broadcasts and web use of the Commercials, Defendants HomeAdvisor and Hawthorne Direct have embedded posts on and links to the Commercials on their own respective branded websites and social media platforms, and on other third-party internet platforms, *e.g.*, YouTube, and in particular Hawthorne Direct to tout and brag about its expertise in creating such video works (See, Exh. "J" hereto). Defendants threaten to permanently post the Commercials to their respective websites which, if acceded to by Bovinett, would add to the harm and further strip Bovinett of control over his identity and persona resulting in self-inflicted reputational and competitive harm which he is lawfully entitled to avoid.

### **HomeAdvisor and Hawthorne Direct Refuse to Come to Plaintiff's Aid**

81. From and after April 2016, and in particular after HomeAdvisor had been notified by Bovinett's print agent to cease and desist and otherwise take down the offending images, HomeAdvisor never sought or received Bovinett's permission to continue to use Bovinett's

likeness or identity in connection with HomeAdvisor's commercial activities, services or business via the offending Commercials.

82.   Had Bovinett been advised beforehand that use of the still photographs from the Shoot were intended to be used in television Commercials and otherwise for inclusion in video-based works destined for transmission via the internet and social media, much less in violation of his Union's rules, Bovinett would not have permitted HomeAdvisor and/or Hawthorne Direct to use Bovinett's identity or likeness in connection with any of Homeadvisor's broadcast Commercials or internet or social media transmissions of such video works. In particular, Bovinett would not have consented to such uses of his likeness in Commercials which might be in direct conflict with Bovinett's relationship to his Union and/or to other valuable modeling and/or acting opportunities which are or may be impacted by the competitive disadvantage in which his appearance in the Commercials could exclude him, *e.g.*, in relation to similar types of industries for which he might otherwise be booked (See, Exh. "F" hereto).

83.   Because of his high professional standards, talent and reputation, Bovinett's services have come to be well and favorably known in his professional sphere via his modeling and acting engagements, and both other agents and clients have also benefitted economically from their association with him and his various commercial activities aforesaid.

84.   As a result of such knowledge and regard of him, and by virtue of their unique intrinsic and personal value, Bovinett's likeness, identity, image, look and persona have developed significant commercial worth in promoting himself as well as the products and services of others.

85.   Bovinett has been damaged by Defendants, and is threatened to be so damaged in the future by such Defendants, whose unauthorized acts, omissions and concealments falsely suggest and imply Bovinett's endorsement and/or approval of HomeAdvisor's commercial activities via the television broadcast and internet and social media dissemination of the Commercials, and otherwise harm Bovinett with respect to potentially competitive opportunities which are threatened to be destroyed. The co-opting of Bovinett's identity, likeness and persona

20

by Defendants, thereby damages Bovinett by diminishing and threatening his potential to endorse, associate, affiliate and otherwise work in connection with other lucrative bookings.

## **ANGI Homeservices Commences Violating Plaintiff's Rights**

86.   At or about summer 2017, Plaintiff first heard of plans for IAC/InterActiveCorp to merge its HomeAdvisor unit with a competitor, Angie's List. Just before the instant action was originally filed, at or about August 2017, Plaintiff learned such combination was more definite, and based upon public statements regarding IAC's plans to complete the Merger by the end of 2017, Plaintiff joined ANGI Homeservices as a Defendant in the original filing of this action with respect to the likely prospect it would be using the Commercials for its own financial gain.

87.   In fact, the Merger was completed on or about September 29, 2017, and on October 2, 2017, ANGI Homeservices was first listed on the Nasdaq stock exchange, and first commenced doing business as a new entity (See, Exh. "K" hereto).

88.   From and after that time, ANGI Homeservices, with full knowledge that Bovinett had not given his consent or permission to any Defendant to use his image, likeness and persona in any video-based television Commercials, and without attempting to aid Bovinett in light of the tortious conduct and other wrongs perpetrated against him by HomeAdvisor and Hawthorne Direct, instead deliberately embarked upon a course of conduct intended to injure Bovinett's personality and privacy rights, and all for the purpose of financial gain to ANGI Homeservices.

89.   The use and threatened ongoing use of Bovinett's identity, likeness and persona was unauthorized because no Defendant had ever sought or obtained Bovinett's consent to use his identity, likeness and persona in connection with the video-based Commercials (See, Exhs. "D," "E," "F," "G," and group "I" hereto).

90.   ANGI Homeservices' use of Bovinett's likeness was and is willful because ANGI Homeservices, from and after October 2017, has used and uses Bovinett's identity, likeness and persona intentionally despite knowing that such use was and is not authorized.

91.   Bovinett's right to control and use his likeness, image and persona has been damaged by ANGI Homeservices' unauthorized use of his identity, likeness and persona which,

in many cases involves such use to showcase, feature and highlight Bovinett's likeness in order to emphasize his role in connection to HomeAdvisor's services (See, group Exh. "I" hereto). In fact, on information and belief, Bovinett's imgae and likeness appear more often and in more Commercials than any other HomeAdvisor "brand ambassador" (*Ibid*. Exh. "I").

92. Bovinett is informed and believes that as of the filing of this amended complaint: (i) there are and/or have been at least 57 video-based Commercials incorporating his photographic likeness, (ii) HomeAdvisor, Hawthorne Direct, and now ANGI Homeservices as successor to HomeAdvisor, have blanketed the airwaves with those Commercials via all forms of television for approximately 197,332 runs, and (iii) there have been more than approximately 5.1 million additional airings and/or transmissions of such Commercials via the internet and social media; and all of which continued to increase in number at or about 2016 and into 2017.

93. Attached hereto are various B&W low-resolution screen grabs from a sampling of the Commercials into which the still photographs of Bovinett have been unlawfully incorporated by HomeAdvisor and Hawthorne Direct, and as posted by them on the internet including on YouTube, and used outside the scope of Plaintiff's actual consent (See, group Ex. "I" and Exh. "J" hereto.)

### COUNT I
### PLAINTIFF'S CLAIM FOR COMMON LAW FRAUD
### (vs. HOMEADVISOR, and HAWTHORNE DIRECT)

94. Plaintiff realleges and incorporates by reference Paragraphs 1 through 93 hereof, and in the alternative to each other count in this Complaint alleges:

95. This claim for relief is directed against Defendants HomeAdvisor and Hawthorne Direct, and each of them jointly and severally.

96. Defendants' conduct, as more particularly described herein, was engaged in willfully, with the intention that Plaintiff would rely thereon and the Plaintiff did, in fact, so rely to his detriment, suffering damage and injury thereby.

97.   By virtue of the foregoing premises, Defendants HomeAdvisor and Hawthorne Direct, have fraudulently induced Bovinett to act to his detriment, and otherwise defrauded him, and such Defendants have done so with malice.

98.   As a direct and proximate result of Defendants' acts and conduct, Bovinett has suffered and sustained tortious injury and damage.

99.   Said conduct constitutes a malicious fraud upon the Plaintiff.

100.   Unless Defendants are stopped, Bovinett will continue to be so injured.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants HOMEADVISOR, and, HAWTHORNE DIRECT, and each of them jointly and severally together with Doe Defendants who may be liable: (a) that Defendants be found to have defrauded Bovinett; (b) that the Court enter an order which includes an award of damages, in an amount to be determined, but not less than $4.65 million; and (c) for equitable and other relief as more fully set forth herein, (d) plus costs.

**COUNT II**
**PLAINTIFF'S CLAIM FOR CIVIL CONSPIRACY**
**TO COMMIT FRAUD**
**(vs. HOMEADVISOR AND HAWTHORNE DIRECT)**

101.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 93 hereof, and in the alternative to each other count in this Complaint alleges:

102.   This claim for relief is directed against Defendants HomeAdvisor, and Hawthorne Direct, and each of them jointly and severally.

103.   That Defendants HomeAdvisor and Hawthorne Direct, and various persons, firms and other participants, both known and unknown, agreed and conspired to accomplish the unlawful purpose(s) as alleged herein, namely, to wrongfully purport to obtain and use personality rights and other property of and from, and otherwise injure, the Plaintiff.

104.   That in furtherance of the conspiracy, on information and belief, the individuals involved on behalf of HomeAdvisor and Hawthorne Direct made extensive use of text messaging as a more immediate and personally secure means of communicating amongst themselves.

105.   That Defendants knowingly associated and combined with one another intending to further the said unlawful purpose(s); and an overt act was committed by at least one conspirator in furtherance of the conspiracy.

106.   By virtue of the foregoing premises, Defendants, and each of them have conspired to commit the unlawful acts herein alleged.

107.   As a direct and proximate result of the conspiracy, Plaintiff has been caused to and has thereby suffered and sustained economic and personal injury and damages, all of which are ongoing and threatened to continue.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants HOMEADVISOR, and, HAWTHORNE DIRECT, and each of them jointly and severally together with Doe Defendants who may be liable: (a) that Defendants be found to have conspired to defraud Bovinett; (b) that the Court enter an order which includes an award of damages, in an amount to be determined, but not less than $4.65 million; and (c) for equitable and other relief as more fully set forth herein, (d) plus costs.

## COUNT III
### PLAINTIFF'S CLAIM FOR PROMISSORY ESTOPPEL
#### (vs. HOMEADVISOR, and, HAWTHORNE DIRECT)

108.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 93 hereof, and in the alternative to each other count in this Complaint alleges:

109.   This claim for relief is directed against Defendants HomeAdvisor and Hawthorne Direct, and each of them jointly and severally.

110.   That Defendants HomeAdvisor, and on information and belief by Hawthorne Direct with encouragement and full knowledge that such promise would be communicated to Bovinett by his agent, made the unambiguous promise to Plaintiff that if he would furnish his acting and modeling services to the creation and production of the still photographs for print purposes only, HomeAdvisor would pay Bovinett $675 for his services; and that the Photos to be created thereby would be digitally stored in HomeAdvisor's database of imagery, but not be used

in any video-based Commercials designed for broadcast, transmission or dissemination.

111.   That Plaintiff relied upon said promises, and in so doing reposed significant trust and invested substantial risk, effort and goodwill in furtherance of allowing HomeAdvisor to maintain a repository of photographic imagery, but for "print" use only.

112.   That HomeAdvisor, on information and belief together with the full knowledge and encouragement of Hawthorne Direct, particularly with respect to the Commercials being created, produced and aired by Hawthorne Direct, expected that Plaintiff would rely on the aforesaid promises repeatedly made by HomeAdvisor, and it was foreseeable by HomeAdvisor, and Hawthorne Direct, that Plaintiff would do so.

113.   That Plaintiff reasonably and justifiably relied upon the promises of HomeAdvisor aforesaid, to Plaintiff's detriment.

114.   As a direct and proximate result of such detrimental reliance, Plaintiff has been caused to and has thereby suffered and sustained economic injury and damages, and irreparable harm for which money damages alone are inadequate, and which damages and harm are all ongoing and threatened to continue.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants HomeAdvisor and Hawthorne Direct, and each of them jointly and severally together with Doe Defendants who may be liable: (a) that Defendants be found to have violated their said promises; (b) that the Court enter an order which includes an award of damages in an amount to be determined, but not less than $4.65 million; and (c) for equitable and other relief as more fully set forth herein, (d) plus costs.

### COUNT IV
### PLAINTIFF's CLAIM FOR BREACH OF CONTRACT
### (vs. HOMEADVISOR)

115.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 93 hereof, and in the alternative to each other count in this Complaint alleges:

116.   This claim for relief is directed against Defendant HomeAdvisor.

117.   At or about October 8, 2014, it was agreed by and between Bovinett and Defendant HomeAdvisor, at the specific request of HomeAdvisor, that Bovinett would furnish professional modeling services to Defendant, with respect to non- video-based, non-broadcast advertising to be produced by Defendant to promote and market HomeAdvisor's home improvement services.

118.   The parties further agreed upon certain terms and conditions for the aforesaid services, including the photographer selected to create the still photographs, the duration of the Shoot, the price for Plaintiff to participate in the Shoot, and permissible uses for such photographs of Bovinett, namely for "print," *i.e.*, non-video, non-broadcast use only.

119.   The parties further agreed the still photographs of Bovinett to be created at the Shoot were not meant to be included in Commercials for television broadcast or internet or social media transmission as part of any audio-visual, video-based or motion picture work.

120.   On or about October 8, 2014, Bovinett performed, completed and delivered the performance of modeling services aforesaid pursuant to the terms of the parties' agreement, and all at the specific instance and request of HomeAdvisor.

121.   That on or about April 12, 2016, HomeAdvisor's refusal to stop using Bovinett's likeness in its Commercials (See, Ex. "E" hereto) based upon the bogus Consent form (See, Exh. "C" hereto) evidenced HomeAdvisor's clear intention to refuse to cease and desist using the still photographs depicting Bovinett's likeness and/or to negotiate an appropriate license, if possible, for such use of Bovinett's likeness and persona, including Union-based sums otherwise due (*e.g.*, residuals and fringes), for broadcast use of the Commercials via television and via the internet and social media, and constitutes HomeAdvisor's definitive and unequivocal repudiation of its contractual obligations to Bovinett.

122.   Bovinett has performed all conditions, matters and things required by him to be performed under the parties' bargain.

123.   As a direct and proximate result of HomeAdvisor's breach(es), Bovinett has suffered and sustained damage, and there is due and owing to Bovinett from the Defendant

HomeAdvisor therefor, sums of money for unauthorized uses of his likeness and persona, as herein alleged.

124.   In addition, HomeAdvisor owes Bovinett sums of money for uses and lost opportunities which, but for the repudiation of the parties' agreement aforesaid by HomeAdvisor, would have accrued to the benefit of Bovinett after the filing of this Lawsuit.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants, and each of them jointly and severally with Doe Defendants who may be liable: (a) that Defendants be found to have breached the agreement with Bovinett; (b) that the Court enter an order which includes an award of damages, in an amount to be determined, but not less than $4.65 million; and (c) for equitable and other relief as more fully set forth herein, (d) plus costs.

**COUNT V**
**PLAINTIFF'S CLAIM OR SUCCESSOR LIABILITY FOR**
**HOMEADVISOR'S UNLAWFUL ACTS HEREIN ALLEGED**
**(vs. ANGI HOMESEVICES)**

125.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 93 hereof, and in the alternative to each other count in this Complaint alleges:

126.   This claim for relief is directed against Defendant ANGI Homeservices.

127.   ANGI Homeservices has been organized and designed to succeed to both the business and liabilities of HomeAdvisor, and is thereby to be bound by the obligations of HomeAdvisor as successor-in-interest or otherwise as having assumed such obligations.

128.   That ANGI Homeservices had notice, by virtue of the continuation of the senior management team and otherwise, and was well aware of the Plaintiff's claims, at or about the time of the consummation of the Merger.

129.   That HomeAdvisor, as noted throughout the ANGI Homeservices Form 10-K filed during March 2018, particularly financial disclosures, was well capable of providing the relief requested by Plaintiff both before and after the Merger, with no material effect on its bottom line.

130.    That by virtue of the identity of the senior management team of HomeAdvisor, as well as the ownership of such entities by parent IAC/interActiveCorp, *inter alia*, both before and after the Merger, there is such a substantial continuity between the operations of HomeAdvisor and ANGI Homeservices, that successor liability may properly be imposed upon ANGI Homeservices for the tortious, promissory and other obligations and liabilities of HomeAdvisor to Plaintiff, and the consequences flowing therefrom.

131.    That ANGI Homeservices, as a result of the Merger and otherwise, from and after approximately October 2017, stands in the shoes of HomeAdvisor and/or the business pertaining to exploitation of the HomeAdvisor brand.

132.    That in equity and good conscience, ANGI Homeservices should be made to answer and be held liable for the tortious acts and promises, of HomeAdvisor as herein alleged.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendant ANGI Homeservices, including jointly and severally together with HomeAdvisor and Hawthorne Direct, and one or more Doe Defendants who may be liable: (a) that Defendant ANGI Homeservices be found to be obligated to answer for and be held responsible for the tortious acts and breaches heretofore alleged against HomeAdvisor; (b) that the Court enter an order which includes an award of damages, in an amount to be determined, but not less than $4.65 million; and (c) for equitable and other relief as more fully set forth herein, (d) plus costs.


### COUNT VI
### PLAINTIFF'S CLAIM FOR CONTRACT IMPLIED IN FACT RELIEF
### (vs. HOMEADVISOR, HAWTHORNE DIRECT, and ANGI HOMESERVICES)

133.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 93 hereof, and in the alternative to each other count in this Complaint alleges:

134.    This claim for relief is directed against Defendants HomeAdvisor, Hawthorne Direct and ANGI Homeservices, and each of them jointly and severally.

135.   Defendants' acts and conduct alleged herein demonstrate a request to Bovinett to perform modeling and acting services to be captured in still photographs for "print" purposes only, and he did so.

136.   That the parties understood and assented to the bargain that there was to be no use of such still photographs in any form of video-based media, nor for any exploitation via any means of television broadcast including transmission via the internet and social media.

137.   HomeAdvisor's and Hawthorne Direct's acts, and from and after October 2017 those of ANGI Homeservices, constitute a tardy and unlawful attempt to reject and disavow such assent.

138.   That Defendants acts and conduct violate an implied-in-fact bargain.

139.   Such acts and conduct by Defendants give rise to a right in Bovinett which may be enforced by the Court's imposition of an implied-in-fact remedy.

140.   Defendants' acts are willful and have damaged Bovinett.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants, and each of them jointly and severally with Doe Defendants who may be liable: (a) that the Court fashion implied-in-fact relief against Defendants for their violations; (b) that the Court enter an order which includes an award of damages in an amount to be determined, but not less than $4.65 million; and (c) for equitable and other relief as more fully set forth herein, (d) plus costs.


**COUNT VII**
**PLAINTIFF'S CLAIM FOR CONTRACT IMPLIED-IN-LAW RELIEF**
**(vs. HOMEADVISOR, HAWTHORNE DIRECT, and ANGI HOMESERVICES)**

141.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 93 hereof, and in the alternative to each other count in this Complaint alleges:

142.   This claim for relief is directed against Defendants HomeAdvisor, Hawthorne Direct, and ANGI Homeservices, and each of them jointly and severally.

143.   Defendants' acts and conduct alleged herein demonstrate a request to Bovinett to perform modeling and acting services to be captured in still photographs for "print" purposes only, and he did so.

144.   That the parties understood and assented to the bargain that there was to be no use of such still photographs in any form of video-based media, nor for any exploitation via any means of television broadcast including transmission via the internet and social media.

145.   HomeAdvisor's and Hawthorne Direct's acts, and from and after October 2017 those of ANGI Homeservices, constitute a tardy and unlawful attempt to unjustly enrich themselves.

146.   That Defendants' acts and conduct violate the implied-in-law bargain.

147.   Such acts and conduct by Defendants give rise to a right in Bovinett which may be enforced by the Court's imposition of a quasi-contractual, implied-in-law remedy.

148.   Defendants' acts are willful and have damaged Bovinett.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants, and each of them jointly and severally with Doe Defendants who may be liable: (a) that the Court fashion implied-in-law relief against Defendants for their violations; (b) that the Court enter an order which includes an award of damages in an amount to be determined, but not less than $4.65 million; and (c) for equitable and other relief as more fully set forth herein, (d) plus costs.

## COUNT VIII
## PLAINTIFF'S CLAIM FOR VIOLATION OF THE
## ILLINOIS RIGHT OF PUBLICITY ACT
## (vs. ANGI HOMESERVICES)

149.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 93 hereof, and in the alternative to each other count in this Complaint alleges:

150.   This claim for relief is directed against Defendant ANGI Homeservices.

151.   That at or about October 2, 2017, ANGI Homeservices began doing business as a

new entity post-Merger, including using the HomeAdvisor Commercials for economic gain.

152.    ANGI Homeservices' use of Plaintiff's identity and likeness was unauthorized because ANGI Homeservices did not seek or obtain Plaintiff's consent to use of his identity in connection with the Commercials or otherwise, from and after October 2, 2017.

153.    ANGI Homeservices' unauthorized use and ongoing use of Plaintiff's identity and persona for commercial purposes is a violation of the Illinois Right of Publicity Act, 765 ILCS 1075/30(a), *et seq*.

154.    ANGI Homeservices' use of Plaintiff's identity and persona was willful because it used Plaintiff's identity intentionally and with knowledge that such use was not authorized.

155.    Plaintiff's right to control and use his identity and persona has been violated and damaged by ANGI Homeservices's unauthorized use of his identity and persona.

WHEREFORE, Plaintiff Bovinett prays for judgment in his favor and against Defendant ANGI Homeservices, including  jointly and severally with Doe Defendants who may be liable: (a) that Defendant be found to have violated Bovinett's commercial personality rights under the Illinois Right of Publicity Act; (b) that the Court enter an order which includes an award of damages in an amount to be determined, but not less than $4.65 million; and (c) for equitable and other relief as more fully set forth herein, (d) plus costs.

### COUNT IX
### PLAINTIFF'S CLAIM FOR ILLINOIS COMMON LAW INVASION OF PRIVACY BY MISAPPROPRIATION OF IDENTITY (vs. ANGI HOMESERVICES)

156.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 93 hereof, and in the alternative to each other count in this Complaint alleges:

157.    This claim for relief is directed against Defendant ANGI Homeservices.

158.    By virtue of the foregoing premises, ANGI Homeservices has co-opted and expropriated Plaintiff's identity and persona, and has done so with malice or reckless disregard.

159.   As a direct and proximate result of ANGI Homeservices' acts and omissions, Plaintiff has suffered divers nervous shocks and mental pains, and sustained personal injury and damage.

160.   Unless ANGI Homeservices is stopped, Plaintiff will continue to be so injured.

WHEREFORE, Plaintiff Bovinett prays for judgment in his favor and against Defendant ANGI Homeservices, including jointly and severally with Doe Defendants who may be liable: (a) that Defendants be found to have violated Bovinett's personal privacy rights by misappropriation of his identity; (b) that the Court enter an order which includes an award of damages in an amount to be determined, but not less than $4.65 million; and (c) for equitable and other relief as more fully set forth herein, (d) plus costs.

## COUNT X
### PLAINTIFF'S CLAIM FOR AIDING AND ABETTING
### (vs. HOMEADVISOR, and HAWTHORNE DIRECT)

161.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 93 hereof, and in the alternative to each other count in this Complaint alleges:

162.   This claim for relief is directed against Defendants HomeAdvisor, and Hawthorne Direct, and each of them jointly and severally.

163.   That ANGI Homeservices committed the wrongful and tortious acts aforesaid, including violation of Plaintiff's rights of publicity and misappropriation invasion of privacy.

164.   That Defendant HomeAdvisor, together with various firms and persons, both known and unknown, including but not limited to Hawthorne Direct, on information and belief encouraged ANGI Homeservices to accomplish the unlawful, wrongful acts which caused injury to Bovinett as alleged herein.

165.   That Defendants HomeAdvisor and Hawthorne Direct knowingly and substantially assisted ANGI Homeservices with the intent that ANGI Homeservices accomplish the said unlawful purpose(s).

166.   By virtue of the foregoing premises, Defendants HomeAdvisor and Hawthorne Direct, and each of them have aided and abetted ANGI Homeservices' violation of Plaintiff's

publicity, misappropriation privacy and other rights as herein alleged.

167.   As a direct and proximate result of such aiding and abetting, Plaintiff has been caused to and has thereby suffered and sustained economic and personal injury and damages, all of which are ongoing and threatened to continue.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants HomeAdvisor, and Hawthorne Direct, and each of them jointly and severally together with Doe Defendants who may be liable: (a) that Defendants be found to have aided and abetted ANGI Homeservices to violate Plaintiff's publicity, privacy and other rights; (b) that the Court enter an order which includes an award of damages, in an amount to be determined, but not less than $4.65 million; and (c) for equitable and other relief as more fully set forth herein, (d) plus costs.

<u>**COUNT XI**</u>
**PLAINTIFF'S CLAIM FOR UNJUST ENRICHMENT**
**(vs. HOMEADVISOR, ANGI HOMESERVICES, and HAWTHORNE DIRECT)**

168.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 93 hereof, and in the alternative to each other count in this Complaint alleges:

169.   This claim for relief is directed against Defendants HomeAdvisor, ANGI Homeservices, and Hawthorne Direct, and each of them jointly and severally.

170.   Defendants' acts and conduct evidence their unjust retention of, and/or intent to retain, a benefit to the Plaintiff's detriment.

171.   By virtue of the foregoing premises, Defendants have and will violate fundamental principles of justice, equity and good conscience, and have done so with malice.

172.   As a direct and proximate result of Defendants' acts and conduct, Bovinett has suffered injury and damage.

173.   Unless Defendants are stopped, Bovinett will continue to be so injured.

174.   Defendants' acts are willful and have damaged Bovinett.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants, and each of them jointly and severally with Doe Defendants who may be liable: (a) that Defendants

be found to have been unjustly enriched to Plaintiff's detriment; (b) that the Court enter an order which includes an award of damages and profits in an amount to be determined, but not less than $4.65 million; and (c) for equitable relief as more fully set forth herein, (d) plus costs.

**COUNT XII**
**PLAINTIFF'S CLAIM FOR RESCISSION AND RESTITUTION**
**(vs. HOMEADVISOR, ANGI HOMESERVICES, and HAWTHORNE DIRECT)**

175.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 93 hereof, and in the alternative to each other count in this Complaint alleges:

176.   This claim for relief is directed against Defendants HomeAdvisor, ANGI Homeservices, and Hawthorne Direct, and each of them jointly and severally.

177.   Defendants' wrongful acts and conduct in procuring the print agent's signature to the "Consent" form, and ANGI Homeservices from and after October 2017, give rise to a right of rescission in Plaintiff.[2]

178.   By virtue of the foregoing premises, the Court has the power to restore to the Plaintiff that which was and will be taken from him by Defendants who have acted inequitably, and have done so with malice.

179.   As a direct and proximate result of Defendants' acts and conduct, Bovinett has suffered injury and damage.

180.   Unless Defendants are stopped, Bovinett will continue to be so injured.

181.   Defendants' acts are willful and have damaged Bovinett.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants, and each of them jointly and severally with Doe Defendants who may be liable: (a) that Defendants be found to have engaged in conduct remediable by rescission and restitution; (b) that the Court enter an order which includes an award of damages, in an amount to be determined, but not less

---

[2]  Plaintiff does not concede the "Consent" form is a valid and binding instrument. But, to the extent same could be found, even in part, Plaintiff seeks relief under the Court's rescissionary power as an alternative to, and without admitting the document has any validity.

than $4.65 million; and (c) for relief as more fully set forth herein including that the purported "Consent" form unlawfully procured by Defendants be rescinded, (d) plus costs.

## COUNT XIII
### PLAINTIFF'S CLAIM FOR DECLARATORY JUDGMENT
### (vs. HOMEADVISOR, HAWTHORNE DIRECT, and, ANGI HOMESERVICES)

182.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 93 of this Complaint, and in the alternative to each other count in this Complaint alleges:

183.    This claim for relief is directed against Defendants HomeAdvisor, ANGI Homeservices, and Hawthorne Direct, and each of them jointly and severally.

184.    There is a real and substantial controversy between Plaintiff Bovinett and Defendants HomeAdvisor, Hawthorne Direct and ANGI Homeservices.

185.    That such controversy exists between Plaintiff and Defendants over the matters at issue as described and alleged herein above.

186.    That pursuant to 28 U.S.C. § 2201, the Declaratory Judgment Act, this Court is empowered to render a declaratory judgment to determine certain rights among the parties.

### Pertaining to Copyright Preemption of Personality Rights:

187.    That the Consent form as drafted by Defendants HomeAdvisor, with the aid of Hawthorne Direct, and now relied on by ANGI Homeservices, purports to assign, on Plaintiff's behalf, all "copyright and other rights" in and to the still photographs created at the Shoot (See, Exh. "C" hereto).

188.    To the contrary, the photographer Todd Rosenberg's license to HomeAdvisor at or about mid-October 2014 in such regard, provides that "All images remain © copyright Todd Rosenberg Photography, Inc. Payment does not transfer any copyrights."

189.    Federal courts are divided over whether the right of publicity may be preempted by the Copyright Act when such right is embodied in a performance, *i.e.*, fixed in a tangible

medium of expression, and thereby becomes intertwined with the subject of the copyright protected work.

190.   But where the unauthorized use of Plaintiffs identity is used in a manner which extends beyond the copyright protected work, *e.g.*, (i) where a plaintiff's image is used in a medium or for a purpose outside the scope of any lawful consent, and/or (ii) where the capture and use of a plaintiff's image is procured by a fraud or other unlawful or inequitable conduct, then such right of publicity is not preempted by the Copyright Act.

191.   Therefore, the controversy at hand presents a claim requiring construction of the Copyright Act, namely, how § 301 of the Act is to be interpreted in light of the principal of preemption of the personality rights being violated.

192.   Although authority in the Seventh Circuit is favorable to Plaintiff, the question of whether copyright preempts the right-of-publicity is a real and immediate controversy here.

193.   Plaintiff seeks this Court's declaration that no right of publicity in his persona or personality rights has been preempted by the Consent form or otherwise in these circumstances.

### **Pertaining to Other Rights to be Determined:**

194.   Further, Plaintiff seeks this Court's declaration:

(a)   That he has duly performed all of the services and obligations required by him to be performed under the bargain he made for the Shoot;

(b)   That the "Consent" form purported to be made on Plaintiff's behalf (Exh. "C") is unlawful as violative of public policy and therefor void or voidable as an illegal attempt by Defendants to exculpate their own intentional acts;

(c)   That the "Consent" form purported to be made on Plaintiff's behalf (Exh. "C") was void *ab initio*; as having been procured by fraud;

(d)   That the "Consent" form purported to be made on Plaintiff's behalf (Exh. "C") by his print agent is void for lack of authority;

(e)   That the term "Library" as used in the context of the Casting Notice (Exh. "B"), is vague, imprecise and does not connote Plaintiff's general abandonment to Defendants of, or

consent to grant an unlimited license to Defendants to use still photographs of, his likeness, look and persona for all purposes, in all media in perpetuity;

(f)   That the term "buyout" as used by the print agent in context of the circumstances surrounding the Shoot (Exh. "G") is vague, imprecise and does not connote Plaintiff's general abandonment to Defendants of, or consent to grant an unlimited license to Defendants to use still photographs of, his image, likeness and persona for all purposes, in all media in perpetuity.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants, and each of them jointly and severally with Doe Defendants who may be liable: (a) that the Court fashion declaratory relief in favor of Bovinett and against Defendants as appropriate; (b) that the Court enter an order which includes an award of damages, in an amount to be determined, but not less than $4.65 million; and (c) for equitable and other relief as more fully set forth herein, (d) plus costs.

### COUNT XIV
### (PLAINTIFF'S CLAIM FOR LIABILITY vs. DEFENDANTS DOE I–V)

195.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 93 of this Complaint, and in the alternative to each other count in this Complaint alleges:

196.   Further to the Court's Order pertaining to assertion of claims against Doe Defendants under federal question jurisdiction, Plaintiff alleges as follows.

197.   On information and belief, one or more individual(s), firm(s), affiliate(s) or contractor(s), acting in concert with HomeAdvisor and/or Hawthorne Direct, and from and after October 2017 ANGI Homeservices, was or is a conscious, active and dominant force causing or contributing to cause, and which resulted in or will result in, the unlawful acts and violations herein above alleged.

198.   That although the proper name(s) of such Doe individuals and/or firm(s), and the precise nature of their participation, is not presently known, the circumstances presented here demonstrate Plaintiff may, upon further discovery or otherwise, include various seniormost

executives at the firms sued, namely, HomeAdvisor, Hawthorne Direct and ANGI Home Services, and one or more individuals in their respective teams of personnel responsible for assisting in the fraud, conspiracy and other wrongs alleged.

199. That other Doe Defendants are or may be corporate or limited liability entitiy(s) which are affiliated with, subsidiaries of, or otherwise related to the Defendants, including but not limited to IAC/InterActiveCorp.

200. On information and belief, there are various persons and firms who financially benefitted from and/or retained rights to exercise control over such unlawful activities as are alleged above, or will do so in the future, and may therefore be vicariously liable for such acts and violations.

201. On information and belief, those individuals, firms, affiliates and/or contractors above referenced who personally or directly contributed to, authorized and/or participated in violating Bovinett's rights and infringing upon Bovinett's likeness, identity and persona, and his exclusive rights therein and otherwise, are also likely to have violated his rights by the various means aforesaid.

202. That such wrongful acts herein alleged against such Doe Defendant(s) were and are for their own individual gain and benefit, as well as the gain and benefit of their firms, affiliates or contractors, and infringe upon Bovinett's exclusive rights in his identity and persona.

203. That by virtue of the acts herein above alleged, Defendants Doe I through Doe V violated Bovinett's rights, and otherwise violated his persona as heretofore alleged, and he has been caused to and has thereby suffered and sustained irreparable harm and economic injury.

WHEREFORE, Plaintiff prays for judgment in his favor and against Doe Defendants, and each of them jointly and severally together with such named Defendants who may be liable: (a) that Bovinett be found to be damaged and irreparably harmed; (b) that the Court enter an order which includes an award of damages, in an amount to be determined, but not less than $4.65 million; and (c) for equitable, and other relief as more fully set forth herein, (d) plus costs.

PLAINTIFF HEREBY DEMANDS TRIAL BY JURY


Dated:   May  _4th_  2018

                              RAY ALAN BOVINETT, Plaintiff


                         By:  ____/s/  Mark Barinholtz_____
                                        Attorney


Mark Barinholtz
MARK H. BARINHOLTZ, P.C.
Attorney for Plaintiff
55 West Monroe Street
Suite 3600
Chicago, IL 60603
(312) 977-0121

**CERTIFICATE OF SERVICE**

The undersigned attorney for Plaintiff hereby certifies that a true and correct copy of the foregoing Plaintiff's Amended Complaint, together with Exhibits "A" through "M" attached thereto, was personally served upon the following attorneys for Defendants:

| | |
|---|---|
| Evan M. Rothstein, Esq. | Barry F. Irwin, Esq. |
| Patrick B. Hall, Esq. | Chris D. Eggert, Esq. |
| Arnold & Porter, *et al*., LLP | Irwin IP LLC |
| 370 Seventeenth St., Suite 4400 | 1333 Burr Ridge Pkwy, Suite 200 |
| Denver, CO 80202 | Burr Ridge, IL 60527 |

via the court's ECF electronic filing system, this  4th  day of May, 2018, at Chicago, Illinois.

By:     */s/ Mark Barinholtz*
Attorney

40